Thank you, Your Honors, and may it please the Court. I'd like to focus on two issues today in particular. The first is when a lower court judge issues a discretionary decision, whether that decision must be accompanied with stated rationales at the time it's issued. The second issue, if we have time, that I would like to focus on is what is the interaction between Rule 56E, which talks about whether the court may take faxes undisputed if it's not opposed at summary judgment, and how that interacts with Rule 56C's requirement that puts a burden on the movement to demonstrate there's no genuine issue of material fact. Starting with the discretionary decisions issue, there are a number of decisions from the lower court below where summary electronic orders were issued, saying granted or not granted, and later on in the litigation, the judge, in particular with regards to seeking scheduling extensions, appears to have changed her rationales over time, causing both confusion for the parties as well as prejudicing Professor Butler's ability to adequately explain to the court why further extensions of time were needed. For instance, a second extension of time for summary judgment was granted, again, with an electronic order that just said, motion granted, no explanation as to why it's granted. At the time I appeared in the case where, as you can see from the record, I discovered that there were no filings prepared to oppose summary judgment, I entered myself pro hoc vicee, and I immediately requested an extension of time because former counsel had not prepared any filings and it was less than 24 hours before those filings were due. Later on, after denying my third motion for extension with no explanation, I sought reconsideration to try to, what I thought was, correct the factual record as well as to remind the district court that even discretionary decisions under this court's precedents require stated rationales. The district court held against my client the fact that, purportedly, the second motion for extension was granted, but it was brought in bad faith. At which point, as motions for reconsideration continued, as I again tried to correct factual findings that weren't supported by the record, as well as some legal points that were contrary to circuit precedent, the district court's rationales for why it did what it did in the past were ever-evolving, making it impossible for my client to meaningfully respond to them proactively. I think part of the problem was that . . . I'm sorry. What was ever-evolving was your client's version of events as to why they couldn't get the motion response on file. In other words, you can't come in and ask for an extension of time based on one set of facts and explanation and representations to the court, and then come in later and ask for another extension based on contradictory representations about why it's needed. And I would understand that, Your Honor, if my client had approved the previous motions for extension. We asked to supplement the . . . Isn't your client responsible for what her lawyer does in the case? Not if her lawyer makes paper filings with the court that she was not apprised of and that are supposedly premised on facts about her workload that were not true at the time. We filed to supplement the record because some documents that were sealed below didn't make it into the electronic record on appeal, and there are detailed declarations. There are ECF numbers 148 and 149. There are detailed records where we gave screenshots of cell phone texts, of emails between my client that are timestamped that say, I just discovered that you filed this saying that it's my fault I couldn't get my grades in on time, and you asked for an extension. You didn't tell me you were asking for this extension. Also, where are the draft filings to review? This is . . . Counsel, what is our review standard, would you say, for the argument you're making right now? I think your review standard, to the extent the district court relied upon the notion that no rationales need be provided for discretionary decisions, that's just a pure issue of law, Your Honor. Judge Brown ultimately does make some explanations, maybe after the fact. You say that . . . I forget your characterization, but there are shifting explanations. But it does seem to me that what we're basically looking at is a fairly common issue of whether the district judge abused her discretion in making decisions on keeping the case moving. You may not accept all that, but she does ultimately give answers. She does ultimately make the decisions that she did. What is your ultimate complaint about this? Is it how she handled summary judgment? What ultimately does this go to, the arguments that you're making now? I think that this ultimately goes to issues that tilted unfairly in Hallease's favor, my client's ability to docket summary judgment, as well as to seek the withdrawal of her counsel to whom she terminated over these very problems, with the summary judgment opposition filings not being prepared at all. Okay. Well, we have that part of your argument. Let me ask you about the discovery issue and the 10-year box, 10-year box. My understanding from what the record shows is that you did not ask . . . I didn't look at all the discovery requests, but looking at the responses to it, you did not specifically ask for the 10-year box, 10-year box, but the appellees responded with whatever it is, the big number, 17,000 pages of discovery, whatever. You can certainly correct me if that's wrong. And it seems to me the issue is, is there anything that was not provided to you that would fit into the category of 10-year box, 10-year box, when you did not specifically ever ask for that? But you did ask for things that, at least my understanding of discovery, in this case, would have covered what was in the 10-year box. So correct me where I've gone astray in that consideration. The 10-year box was requested in discovery. It was also requested in litigation. By specific name, or by . . . it was labeled that way, and it was requested . . . It may have been labeled 10-year dossier, but 10-year dossier in boxes. And the appellees responded to that with what, as far as we could say, would be in compliance with the request. When was it pointed out to them that the argument that perhaps that part of the request had not been complied with? Well, the way it came up, Your Honor, and this is at the record 2993, at a hearing to which a sanction was sought, was that my client produced the 10-year box. My client said during the hearing, I don't have the 10-year box. I last gave it to SMU. I don't have it. At which point, opposing counsel said on the record, we do not have the 10-year box either. After that point, this came up again as we were ready . . . Well, there was a change of appellee's counsel. Kim Askew, lead counsel, then shifts, perhaps, to Ms. Castaneda as lead counsel. I'm not . . . I don't need an answer to all of that. Is it part of it that some of what might be called the 10-year box response may not have been fully understood by the change of defense counsel? I mean, Judge Brown had to deal with all these sorts of variables. So tell me why . . . I mean, ultimately, what we're looking at, was there a failure to disclose or, later, to respond to a discovery of the materials that you wanted? And how . . . I mean, Judge Brown . . . First, did she say all that material was ultimately provided or, this, you were too late to complain about it? Judge Brown denied the 56D motion, partly on the premise that the 10-year box was produced, and she went on to say, it was produced, I read it, it was attached to the summary judgment filings. Well, certainly, there was a lot of material there that would be in the 10-year box. Are you denying that? I mean, that's my understanding of it. I haven't explored the record in depth before oral argument. So what was produced that you can see on the record in the summary judgment appendix, which starts at record 1937 and runs to 2172, are mostly their long declarations for witnesses. It's a couple of . . . sorry, a handful of decision-maker letters supposedly interpreting the contents of the 10-year box, but the 10-year box itself was not produced. And when I mean box, I don't mean . . . we weren't asking for the physical box. SMU calls the total 10-year application the box. There was a physical box. A form of art that doesn't apply anymore. 2015, there was a physical box, Your Honor. But, I mean, for instance, to make an analogy here, when your honors were nominated for judgeships, there's a long application. You have to provide records of all of these things to be evaluated by the Senate for confirmation. And then senators can ask you questions about what's in your record, what's not in your record. The equivalent of what we were given and what the court was given at summary judgment was a handful of papers from the 10-year box purporting to, among other things, interpret student evaluations from other peers, but we were not given all of the copies of the evidence of my client's qualifications for tenure. Because it was a physical box, it's not . . . they're scanned now. Are you looking for the underlying documents, or you're saying there are other documents in addition to what you just characterized? There are other documents in addition to those, but the most important ones for this case, because she was denied tenure on the premise of her teaching, are the student evaluations, the class evaluations. If you would go to, for example, Dean Collins' letter where she explains her reasons for voting against tenure as the dean, that starts at record 2097, she references reading all of these evaluations. She purports to quote from evaluations. None of those evaluations, or the vast majority of them, are not in their appendix. We don't know where they come from. So you said Judge Brown quoted from something. So she had them . . . No, Judge . . . sorry. Dean Collins, one of the tenure decision makers, quotes . . . I'm not keeping up. Yeah. And the issue with the district court was this. We moved under Rule 56. There was no tenure box. I attached exhibits. There were 14 exhibits attesting to the importance of the tenure box, the required declaration, pointing out in the record where defendants said that they didn't have the tenure box. Eleven months later, after this was summarily denied, Judge Brown came back with a written decision in which she says, I believe the tenure box was produced because I read it. It was attached at summary judgment. Well, I certainly appreciate your position in needing to make the best argument available to you. Let me make sure, when this first came up, there is at least some point in either what Judge Brown said, or maybe it's just the other side, that the only identified missing items was the table of contents and the kind of tabs that would have been in the box separating material. That's not . . . So is the argument that you're making now, here are the kinds of things, student evaluations, whatever else you said, was that presented to Judge Brown, and if so, when? It was. So it was presented to Judge Brown at the March 8th hearing that turned into an oral argument. It was presented again in the 56D motion, supported by two different declarations. It was also pointed out in our pretrial joint report, as well as in Professor Butler's proposed findings of fact and law, it was repeatedly elevated to the Court. Counsel, let me ask you, I guess I'm shifting gears on you here. Yes. If we were to agree with you on the preemption issue, the TCHRA issue, what kind of relief would you expect from that? Would that change everything with regard to your other issues, or does that only get you part of the way, or is that only a component part of a first element of relief that you're asking us for? It depends how the Court resolves the other issues. At minimum, if the Texas preemption issue is corrected, the case would need to be remanded because no discovery was conducted on the defamation claims themselves, to the extent the defamation claims are premised on the notion that the tenure reviewers said that they were denying tenure on the premise of what appears from the discovery we were provided, evaluations that never existed, that seemingly could play to the tenure denial claims, too. Do all these claims against the co-workers really arise from the same locus of facts as against the employer, the law school? In other words, aren't these claims preempted because they're just artfully pled against co-workers who were all involved in the tenure process? As a matter of Texas law, no, Your Honor. Where's the distinguishing line? The distinguishing line would be in the defamation claims themselves. Professor Butler complains about defamatory statements some of those co-workers made outside of the tenure process. Which ones were those? I'm sorry, what? Which ones were those that were outside the tenure process? If I recall right, I believe they're labeled in the complaint statements about what I would that were made after Professor Butler left SMU, as well as statements that were made against her totally outside of the tenure process. Okay. All right, okay. Just a call. Okay. If I could just draw attention to the second point I wanted to make. So this court has been presented in their decent case law in this circuit on the notion that just because summary judgment is unopposed does not mean that there's a default move for the movement. Respectfully, and if this court reviews the summary judgment decision itself, and I've identified points in the brief that were a sampling of what looks like erroneous analysis, Judge Brown took the notion that summary judgment was unopposed as allowing for a finding that all of the stated issues of material fact were undisputed. What she did not do is she did not evaluate even the evidence that SMU presented at that stage. She just full stop agreed this is what their own evidence says. Part of the problem with this, and I can draw attention to one of the particular points on this, is Judge Brown said that SMU complied by all of the rules, the bylines and the guide laws. The bylines are the rules for the law school, the guidelines are the rules for the university as a whole, and one of the key figures that stands out is Dean Collins did not abide by the guidelines deadline for her timing to give a decision on Professor Butler's tenure. She was supposed to give a written decision as of February 1st. She did not give a written decision until 93 days later. That's contrary to SMU's own university rules. That is plainly just she was not following the rules. In an employment discrimination case where there are procedural irregularities, that itself is evidence of bias or can be taken as such. Why would you be entitled to that deadline? I'm sorry, can you? What harm comes from that delay? The harm that comes with the delay is the Dean held back the tenure box from the next decision makers in the sequencing, and it leads to a problem where the Provost, who's the next decision maker after the Dean, issued his decision on Butler's tenure one day after he got Dean Collins' report, which is dated the day before. He supposedly says, and this is in the summary judgment appendix itself provided by defendants, that he spent days, he spent a long time reviewing all of the papers in the tenure box, carefully scrutinizing things, and yet Dean Collins' letter itself reflects that she held on to the box the whole time. It seems impossible under those facts that he actually reviewed it. Counsel, I haven't seen it done this successfully before, but your laptop is hiding the lights and — Yes. Thank you, Your Honor. I appreciate it. It's a pretty good argument, that you didn't know your red light was on? Yes. Thank you, Your Honor. May it please the Court. My trial counsel in my ongoing trial were very understanding about this argument, so there is no trouble for me to get here, and I really appreciate the fact that you all are hearing from us. All I can say is, by the time we were making the decision, I had forgotten about your notice. That's totally fine. Don't blame me for not immediately saying something to the Court that you overlooked. No. It's kind of hard for a lawyer to say that, isn't it? It's nice to get a break and come and see a parade every once in a while, so this is good. I'd like to start by talking about TCRA, because I think that the Court should feel very comfortable about the idea that Judge Lindsey made the right decision in looking at the gravamen of the complaint in ruling on the 12B6 dismissal, and I think that the Court has gotten substantial direction from the Texas Supreme Court, not only in Waffle Street, but in the entire state of Texas, and I think that the Court should feel very  Texas Supreme Court, not only in looking at the gravamen of the complaint in ruling on the 12B6 dismissal, and I think that the Court has gotten substantial direction from the Texas Supreme Court, not only in looking at the gravamen of the complaint in ruling on the 12B6 dismissal, and I think that the Court has gotten substantial direction from the plaintiff. If the plaintiff chooses to plead her defamation claim and link all of it to the employer, and to acts that the employer took through its employees, then I think you can safely say that the gravamen of the complaint is that the employer was defaming the plaintiff in terms of allegations, and it's not, it's an attempt to artfully plead around these claims. And then the court, the court has decided to go back and rewrite the Court to pages 669 through 682 and 687 through 688 of the record, where Ms. Butler lays out her defamation, the first part of her defamation claims, and all of them have to do with the person of her tenure. And it becomes, it gets in the box. That's enough? That makes it preempted? It is enough because Ms. Butler is complaining that she was, the defamation that occurred in the tenure process created a hostile work environment and a discriminatory and unfair tenure process, from evaluation to recommended denial, to vote, to appeal. What about, what about comments? I mean, you heard me ask Counsel Offit, and he said some of this came after she left SMU, and it was sort of retaliatory after the fact. How could that be preempted by TECRA? That's in the rest of the allegations that Ms. Butler sets forth to support her defamation claim, which are found at 682 through 687 of the record, and every single one of those allegedly defamatory statements was made in the EEOC position paper that SMU submitted in response to her claims of defamation, of harassment, discrimination, and retaliation. And so, yes, those statements were made after the fact, but they were made in an EEOC position paper submitted by SMU, not by the individual defendants. In fact, she says at the beginning of every one of those allegations, quote, in its EEOC position paper, defendants did this or that. Defendants didn't do anything in SMU's EEOC position paper. It's SMU's. This is just another attempt to saddle the individuals with something that really is a complaint against SMU. What's the best case you've got to support, I think I called it the dividing line between preempted and not preempted? I think both Waffle House and Steak and Shake are my best cases, and I realize that neither one of them directly addresses this issue, but I think if you look at what those cases say, and then you look at the body of law in which the Texas Supreme Court rejects attempts to artfully plead around a statutory scheme and statutory restrictions, and you read Waffle House and Steak and Shake in light of those cases, I think those two cases do compel the result that I'm asking the Court to reach. Do you think that this might be a circumstance where certification of the question might be appropriate? I don't think so, because I do think that the body of law should give the Court confidence that this is the way the Texas Supreme Court would go. Are those two cases read in the context of the other cases that reject artful pleading? If I might, just give the Court a few examples of that. I think that when you look at that, there is no reason to support thinking that the Texas Supreme Court would adopt an opinion where a plaintiff can artfully plead around TICRA's restriction, TICRA's attempt to universally address workplace discrimination, harassment and retaliation, by artfully pleading that the employer that was a corporation or a university and could only act through its employees is not the real target of the claim. If you look at, for example, Diversicare versus Rubio, that's a 2005 Texas Supreme Court opinion, at 185 Southwest 3rd, 842, the Court rejected the idea that a plaintiff could plead a health care liability claim as a negligence claim, or a premises liability claim in that case, and the Court said, we are not bound by the niceties of pleadings, and a mere recasting of a health care liability claim in the garb of some other cause of action is not sufficient to preclude the application of the statute. The Court has done the same with the arbitration statute. In Merrill Lynch, 235 Southwest 3rd, 185, the Court said that parties to an arbitration agreement may not evade the arbitration statute through artful pleading, such as by naming individual agents of the party to the arbitration clause and suing them in their individual capacity. And in evaluating that issue, the Court said, we can only act through human agents, and we're not going to allow someone to evade the statutes that compel arbitration and uphold an important public policy simply by alleging a claim against a corporation's employees as opposed to the corporation itself. It's done the same thing with the Federal Communications Decency Act in the Facebook case that came out in 2021, saying that if the allegations made by a plaintiff are not are simply another way of claiming that a defendant was liable for conduct made illegal by the statute, they can't evade the statute by pleading a state law tort claim. They've done it with the Texas Education Code in Clint ISD v. Marquez, 487 Southwest 3rd, 538. The Court agreed with the plaintiffs that the constitutional provisions that they had invoked were not school laws that would require a certain procedure to be followed under the Texas Education Code. But the Court said, we do not agree, however, that the way the parents pleaded their causes of action controls the outcome of this case. The nature of the claims, rather than the nomenclature, controls the outcome, controls, and artful pleadings cannot circumvent statutory jurisdictional requirements. And they made clear that the true nature of the parent's complaint, and that was what was going to govern whether the statute applied. Finally, a final example anyway, the Texas Tort Claims Act. The Court in Sampson v. University of Texas, 500 Southwest 3rd, 380, stated that the Tort Claims Act scheme of a limited waiver of immunity from suit does not allow plaintiffs to circumvent the heightened standards of a premises defect claim contained in the statute by recasting the same acts as a claim relating to the negligent condition or use of tangible property. And they went and considered the nature of the claim and looked at that to decide whether it was subject to the statutory requirements. The Court's done that as well with common law situations, rejecting attempts to circumvent common law requirements for one sort of claim or another, premises liability versus negligence, contract versus tort, that kind of thing, throughout the years. And so where I'm going with these cases is that when you look at the hostility and consistent hostility and consistent rejection that the Texas Supreme Court has met attempts to artfully plead around statutes that were meant to govern a certain type of claim or a certain area of the law, and you read Steak and Shake and Waffle House in that context, I think you can be confident that there is not a strong reason to believe that if given the opportunity, the Texas Supreme Court would adopt the position that Judge Lindsey got it wrong. And I think . . . Oh, go ahead. Let me turn to that. If you have time later, let me ask you about discovery in this case. It seems to me this case is maybe premised on the concept that there are these statements that were made that were unfair, discriminatory, whatever else, but there's not yet been full disclosure of what was in the tenure box where that sort of material would have appeared. So why don't you respond to that possibility? The possibility, that's too general. Why should we be satisfied that discovery was properly handled? There does seem to be misunderstandings at times by various counsel, whether that material was provided or not. How do we know if it was, and do we need to know if it was, which is a procedural question, I suppose. Well, I think that the way the Court would know if anything was missing from what SMU produced, and also how the Court would know whether if there was anything missing, it was material, would be for Ms. Butler and Mr. Young to identify that to the Court. And so far, they have not been able to do so. In a way, you may just be saying it's speculative. She has argued in her case, and her case is based on, it seems to me, the potential for unfair discriminatory statements. And so she wanted a complete collection of those statements made regarding her tenure. And there's at least an argument being made in the briefing and again this morning, that all that wasn't turned over, so the particularly smoking gun statements were never provided. I don't see a place in the record where there was any mention made that anything that was added to the box by SMU was not produced. What is allegedly not in there are materials that Ms. . . . How is the tenure box, as a two-word phrase, requested in discovery, and did SMU provide it? Is that your position? Either one of those wrong? The tenure box was not requested. Dossier? The tenure dossier or the materials that were submitted for tenure, I believe, were requested. I mean, the concept I'm looking for, it seems to me there was this collection. Whatever is labeled was the collection requested in discovery, and how do we know if it was provided? And we've represented on the record to the court, under our duties of candor to the court and honesty to the court, that those materials were provided. But you don't have to just take my word for it. Mr. Butler himself, at the January 2023 hearing, on page 3571 of the record, confirmed that they received everything that decision-makers inserted into the box, which I believe would cover . . . that would be the SMU side. So everything that decision-makers wrote and put in the box for others to consider, student evaluations, everything that SMU added, they got, and Mr. Young conceded that. What it looks like they're saying they didn't get is that they didn't get what Ms. Butler submitted for inclusion. I don't think that's accurate. If you look at what we produced, there are materials that I would submit she submitted. And I believe that's what Judge Brown was referring to in her stated reasons. And if you look at page 56 of our brief, we talk a little bit about that aspect of what Ms. Young or what Ms. Butler submitted and how she cannot recall what she submitted and she cannot recall if what we produced lacked anything that she submitted. So I don't . . . I'm a little perplexed at how SMU is supposed to produce more documentation when nothing has been identified that we didn't produce. And we attempted to produce everything that we had that was materials that were considered in the tenure process. Let me ask, do the tenure box have had comments, emails, letters, whatever, from colleagues about her abilities at whatever level? And were those . . . were such things in discovery, provided in discovery? I believe emails were provided. And again, at the same page 3571, I believe that the concession was that emails were provided and that the other side could not identify any emails that weren't provided. And so I've been through many discovery disputes. I know that your Honors have as well. It's just . . . usually in a discovery dispute, someone is at least saying, there's this category of documents that we know we did not get. We know it was in there and we know we didn't get it. And they can't even do that. And so I don't know what to do. Aren't we talking about the context of a Rule 56D motion to reopen discovery? Yes. And so aren't we also talking about . . . I mean, I don't know that that motion was necessarily timely filed. Correct. Correct. So we're talking about a request to reopen something after discovery had otherwise closed? Yes. That was committed to the trial court's discretion. And that was considered in the context of not only its untimeliness and not only the upcoming trial and summary judgment issues, but also considered in the context of the moving party cannot identify anything they didn't get. You mentioned summary judgment. Let's talk about that. You heard counsel opposite say that the district court basically treated it as a default summary judgment motion and then granted it. So I suspect you might have an issue with that. You could explain your side. I do disagree. I don't believe that the court treated it as a default summary judgment. There are two pieces to this. First of all, to the extent that Ms. Butler had an initial burden to bring forward a prima facie case for discrimination or such claims and she did not timely present evidence to meet that burden, then it is entirely appropriate for Judge Brown to hold that there is no evidence that would meet that burden and therefore we don't go any further and that claim is gone. And I don't think that the fact that a plaintiff has a burden to make a prima facie case and fails to even create a genuine issue of material fact on that, I don't think that that transforms a summary judgment into a no evidence summary judgment. That's a traditional summary judgment on a claim that places the initial burden on the plaintiff to even raise the prima facie case. Having said that, on all of the claims, the claims for discrimination and harassment and summary judgment evidence to show that it did not act in a discriminatory fashion or retaliatory fashion or harassing fashion. On all of the claims, SMU provided summary judgment evidence in support of its motion and to the extent that Ms. Butler disputed the concept that SMU followed its policies and procedures, denied tenure because she did not meet the tenure requirements or any other basis for her claims, she was required to come forth and put forth controverting evidence. And in Judge Brown's opinion, I don't think that statements that there is no evidence of something means that she's transferring the burden to the non-movement. I think what she's saying is, in light of the opinion, there's no controverting evidence of these things. So the summary, I'm very confident that the summary judgment record that SMU built and that Judge Brown made her decision upon supports that summary judgment. All right, Counsel. Thank you very much, Your Honor. Thank you, Your Honors. And I'll put my laptop over here so that there's no mistake. Every courtroom's a little bit different. A few quick points. Judge Engelhardt, you raised the possibility of certifying a question to the Texas Supreme Court. I think that might be appropriate. I believe Judge Southwick recently set on a case involving SMU and COVID and a question was certified to the Texas court to get clarification. The clarification might be necessary here. I believe that Waffle House and Steak and Shake support our position. Both cases recognize that there is not total preemption against co-workers for certain torts. The other cases that my friend on the other side references, they're mostly Northern District of Texas cases interpreting Texas law and a few intermediate appellate courts in Texas, not the Texas Supreme Court. On an eerie posture, it's proper to defer to Texas' own interpretation of the law. Is it true that all the statements that are post are in the EEOC statement that SMU filed? No, Your Honor. I believe my friend mischaracterized the complaint. Like most federal complaints, each count incorporates and restates everything above it. There are statements that are made during Professor Butler's employ, during the tenure process, after the tenure process, and then after she left SMU. Did that answer your question, Your Honor? As to the missing discovery, there's no evidence on the record that this box was produced. Below, defendants argue that they were not required to identify the tenure materials by Bates number. That's sort of a customary way in which you say, we served you with what we served you with. It's very odd that even on appeal, they maintain that position. We don't even have to identify these records. And again, the motion, separate point, the 56D motion was timely filed. Under the rules, that motion can only be filed after discovery is closed and before a summary judgment decision has been made. That is the window in which we filed the motion. So it was timely, at least under the rules. Well, maybe timely, but you're still asking to reopen discovery that's otherwise passed. Which is the premise of the 56D motion. That is the only purpose of the 56D motion. Well, that you don't have enough to respond to summary judgment, and so you need to go find. But that motion could either be raised during discovery, I mean, if the motion is filed at that time, or you could have sought this stuff during the discovery period. Yes. This isn't a surprise piece of evidence. We're talking about the tenure box, right? It's not a surprise piece of evidence. It was a surprise that defendants couldn't identify it and they had ever-changing definitions of what they wanted to call the tenure box, the tenure dossier. What we do have below is a statement in November 2019 by Ms. Askew representing to the court, SMU does not have the tenure box. Fast forward to 2023, Ms. Askew provided it before that November hearing. Those two statements cannot both be true. All right, counsel. Thank you, your honors. Both of you. Appreciate you working with us on setting up this time for argument. And thank you, your honors, for allowing